IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID J. WELLES,<br><br>                  Plaintiff,<br><br>     vs.<br><br>ANDREW SAUL, Commissioner of Social Security;[1]<br><br>               Defendant. | **8:18CV444**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on motions for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Filing No. 16 and 18. David Welles appeals a final determination of the Commissioner denying his application for Social Security benefits. This Court has jurisdiction under 42 U.S.C. § 405(g).

## I. BACKGROUND

### A. Procedural History

On January 9, 2015, plaintiff David J. Welles applied for disability benefits under Title II of the Social Security Act; and for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act. Filing No. 1 at 1; Filing No. 12, Court Transcript ("Tr.") at 13. He alleges a disability onset date of November 25, 2014.[2] Filing No. 12-9, Tr. at 355. He must establish disability on or before the date he was last

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019, for a six-year term that expires on January 19, 2025. He is substituted for Nancy A. Berryhill, former acting Commissioner, as defendant.

[2] Welles had filed an earlier application alleging an onset date of December 15, 2011, but that application was denied on November 24, 2014. Filing No. 12-4, Tr. at 123-26. The ALJ in that case found Welles had the following severe impairments: degenerative cervical disk disease and foraminal stenosis with upper extremity radiculopathy, bilateral carpal tunnel syndrome, lower back pain due to annular tear at disk level L5-S1 and chronic right-sided L5 facet fracture with lower left extremity radiculopathy and dysthymic disorder. Id. at 129.

insured, December 31, 2015, in order to be entitled to benefits. *Id.*; *see* 42 U.S.C. § 216(i) and 223. His application was denied initially and on reconsideration. Filing No. 12-2 at 13. He requested and was granted a hearing before an administrative law judge ("ALJ"). After the hearing, the ALJ denied benefits. *Id.* at 27; *see id.* at 34-75. On July 23, 2018, the Appeals Council denied review, and the ALJ's decision stands as the final decision of the Commissioner. *Id.* at 1-3.

Welles challenges the ALJ's finding, arguing that the ALJ implicitly reopened the earlier decision and should have considered the earlier findings in his decision. He also argues that the ALJ erred in discounting the opinions of his treating physician and other medical providers and did not provide sufficient reasons for doing so. He contends the ALJ's RFC determination is not supported by sufficient evidence. Further, citing *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018), he contends the ALJ was not properly appointed under the Appointments clause of the constitution and the ALJ's decision must be vacated. Welles did not raise an Appointments Clause challenge at the administrative level.

**B.    Facts**

**1.    Hearing Testimony**

Welles was born in 1967 and has past relevant work experience as a cook, kitchen supervisor, and assistant kitchen manager. Filing No. 12-4, Tr. at 145. At the hearing on June 16, 2017, Welles testified that he lives in a house in Fremont, Nebraska, with his girlfriend and ten-year-old daughter. Filing No. 12-2, Tr. at 39. At the time of the hearing Welles was five feet, eleven inches tall and weighed approximately 305 pounds. *Id.* at 39. He stated that he left his most recent job because

after he worked for "probably a year with a lot of pain, missing a day or two here and there," he injured his neck and shoulder using table top can opener." *Id.* at 42. He stated he has been dealing with pain in his neck and shoulder since then. *Id.*

Welles stated that his primary physical impairment related to his back "because it's like the core of [his] body and it prevents [him] from doing a lot of things as far as bending over or sitting for long periods of time," but that he also had "numerous other things" related to his neck, shoulder, legs, and toes. *Id.* at 43. He stated that the pain is his lower back is constant and it does not matter if he is sitting, standing, or lying down. *Id.* at 45.

Welles had been diagnosed as diabetic for more than twenty years before the date of the hearing. *Id.* at 47. He is treated with insulin and Metformin. *Id.* He stated he suffers from nerve pain and poor circulation in his feet, and worries that he will lose his feet. *Id.*

Welles testified he underwent a surgical cervical spinal fusion in August of 2015 but stated that he continued to have neck pain despite the surgery. *Id.* at 43-44. Welles stated that he continued to have a limited range of motion in his neck "as far as holding it up straight or looking back or looking towards the table for so long." *Id.* at 44. Welles testified he has had pain, numbness, and tingling from his neck to his left arm and hand, and stated that "it seem[ed] like things [were] right back to where it was [before the surgery]." *Id.* He testified that, although he went to physical therapy for a year, it was not helpful and did not improve his range of motion. *Id.* at 46. He stated he continued to have nerve pain after the surgery. *Id.*

Welles testified he had also been diagnosed with fibromyalgia.  *Id.*  He also complained of mental health problems, stating his mental health was "way worse than I ever could imagine right now besides my physical health."  *Id.* at 48.  He stated his mental and physical pain were so bad that he had considered suicide.  *Id.* at 49.  Welles testified that his mental health deteriorated after the deaths of his father, brother, and son.  *Id.* at 47-48.  He stated he was treated by a counselor who retired two months before the hearing, and he stated he did not have the courage to start over with a new therapist.  *Id.* at 48.

Welles testified that his activities had "changed dramatically in the past five years," noting that he was incapable of participating in family activities such as going to lakes and parks and he testified that his family had gone on vacation without him because he was unable to travel.  *Id.* at 50-51.  He stated that he could potentially walk for three to four blocks, but that his legs would tingle and hurt from even a short walk.  *Id.* at 51.  Welles testified that he could sit for no longer than twenty to thirty minutes at a time.  *Id.*  He stated he had a high level of pain while testifying.  *Id.* at 52.  Welles further testified that he could not lift heavy objects and could not lift anything off the ground, even to pick up sticks in the yard "without possibly blowing out my back or obviously my knees."  *Id.* at 52.  In terms of household activities, Welles testified that he could place laundry in the washer with the assistance of his daughter, but that it was difficult to wash dishes.  *Id.*  He stated that he paid his nephew to complete yard work and to do any physical work that needed to be done.  *Id.* at 45.  Welles testified that he had a valid driver's license but stated he could drive no longer than twenty minutes to a

half-hour before his leg would go numb. *Id.* at 40. He stated that pain radiates through his leg making it difficult to walk when he exits a vehicle. *Id.*

Welles also stated that his personal grooming had deteriorated. *Id.* at 53. He stated that while he previously showered and shaved every day, his pain was so intense that he was no longer able to do so and showered once or twice a week. He testified that he was unable to stand long enough to shave, and no longer shaved his face. *Id.* He also testified to difficulties getting dressed and to difficulty holding his arms up to wash his hair. *Id.*

Welles also testified he did not experience pain relief when alternating positions between sitting and standing every twenty to thirty minutes. *Id.* at 54. He stated that numbness and tingling in his left hand definitely affected his ability to do things and to work. *Id.* at 59. Welles stated that he took pain relief medications, but they only brought his pain level down a little bit, and only for an hour or so. *Id.* at 54. He testified that on a scale of one to ten, his pain was always around a seven to eight, and pain medications would bring the pain to a level of five. *Id.*

Welles stated he exercised as instructed by his physical therapist and used ice to relieve pain. *See id.* at 55-57. He stated that his pain would get to the point that he would have to lie down every day and consequently he spent three to four hours a day reclining. *Id.* at 57. He stated that lying down provided no more than fifteen minutes of relief. *Id.* He testified he slept for no more than two to three hours per night, which resulted in minimal energy. *Id.*

Welles also testified to numbness and tingling in his left arm and hand. *Id.* at 59. He stated he had undergone carpal tunnel surgery on both wrists. *Id.* He stated that

the numbness and tingling affected both his activities of daily living and his ability to work.  *Id.*  He stated that since he could not shower or adequately take care of himself, he thought that he "wouldn't ever be able to perform at any level really a job."  *Id.* at 60.

Welles also stated that he had recently had surgery—a sphincterotomy—related to a "tear in [his] fissure," that resulted in fecal incontinence.  *Id.* at 72-73.  He testified to incontinence (and accidents) both the morning of the hearing and at a recent physical therapy appointment.  *Id.* at 73.  Welles maintained that the unpredictability of his incontinence precluded him not only from "going out into public or like a church or going to visit [his] mom," but also from regular scheduled employment.  *Id.* at 73-74.

A vocational expert also testified at the hearing.  *Id.* at 64-71.  She was asked whether a worker with Welles's education and experience could go back to past work as a cook, kitchen supervisor, or kitchen manager, assuming that the hypothetical worker were limited the full range of light work without the use of ropes, ladders, or scaffold; no concentrated exposure to temperature extremes, vibration or use of foot controls with both lower extremities or exposure to workplace hazards (i.e., unprotected heights or close proximity to dangerous moving mechanical parts); could only climb ramps or stars occasionally; could only balance, stoop, kneel, crouch, or crawl occasionally; could only occasionally reach overhead with the left upper extremity; and was limited to simple instructions and tasks.  *Id.* at 67.  She testified that the claimant's past work would be precluded for a worker with those restrictions, but the worker could find employment in the national economy as an information clerk, a routing clerk, or a furniture rental clerk. *Id.* at 68.  Assuming a hypothetical worker with all the above limitations and the additional limitation that he or she could only stand and sit for thirty minutes at a time,

the vocational expert testified the only job in the national economy for such an individual would be as an information clerk. *Id.* at 68-69. She also testified that that, at the sedentary rather than light exertion level, there would be no jobs in the national economy for such a worker. *Id.* at 69. The vocational expert stated that if the hypothetical worker would have to miss at least three days of work per month, "a person would be precluded from competitive employment." *Id.* Finally, the vocational expert testified that a hypothetical claimant would be precluded from competitive employment if the claimant needed "to have frequent rest periods resulting in the need to recline or keep [his or her] feet elevated." *Id.* at 71.

### 2.    Medical Evidence

Medical records show that Welles has been diagnosed at various times with hypertension under borderline control, diabetes under borderline control, diabetic foot abnormality, depressive disorder, anxiety, cervical spondylosis without myelopathy, brachial neuritis, degenerative disc disease, morbid obesity, hemorrhoids, hyponatremia, tendinitis, type I diabetes with diabetic neuropathy, enthesopathy of foot, diverticular disease, pancreatitis, anal/rectal abscess, super-morbid obesity, major depression, and a disorder of the pharynx. *Id.* at 450, 473, 476, 643, 726, 729, 1129.

Welles has been treated by his primary treating physician, Thomas A. McKnight, M.D., since at least 2013. Filing No. 10-1, Tr. at 474. In late 2013, Welles complained of anxiety, depression, and foot pain. Filing No. 10-2, Tr. at 476. At that time, Welles's surgical history showed he had already received an epidural cervical steroid injection and had bilateral carpal tunnel release surgery in 2000. *Id.* In early 2014, Welles complained of pain in his left wrist, tingling and numbness and difficulty with day-to-day

functioning.  Filing No. 10-1, Tr. at 473.  Dr. McKnight's notes also stated that Welles's blood pressure had "been borderline to poor control."  *Id.*  Welles continued to be treated by Dr. McKnight throughout 2014, complaining of degenerative back disease and back and knee pain that was extreme and constant "all over," on a pain scale of eight out of ten.  *See id.* at 457, 459, 461, 464, 467.  Dr. McKnight noted that Welles reported increased anxiety, stress, insomnia, and depression.  *Id.* at 459.  Dr. McKnight referred him to a counselor to address issues of depression and anxiety.  *Id.* at 458, 459.

Welles saw Dr. McKnight on multiple occasions during the summer of 2014 to address his knee pain as it increased in intensity.  *Id.* at 453, 455, 456, 452, 445.  Dr. McKnight adjusted medications and administered a Kenalog injection.  *Id.* at 451, 454, 463.

On June 18, 2014, Brian H. Cunningham, M.D., treated Welles at the Fremont Area Medical Center.  Filing No. 11-1, Tr. at 967.  Welles sought treatment for his knee pain that intensified with any movement, weight bearing, walking, or transfer.  *Id.*  Dr. Cunningham prescribed hydrocodone and discharged Welles the same day.  *Id.* at 970. Welles returned to the emergency room on July 13, 2014, with high blood sugar and lower back pain which Tramadol did not relieve.  *Id.* at 959, 960.  Dr. Curtis Batten, M.D., prescribed Augmentin, hydrocodone, and Narco, and discharged Welles the same day.  *Id.* at 963.  There is evidence in the record that Hydrocodone made Welles sick. Filing No. 11-8, Tr. at 1299.

On July 7, 2014, Welles visited Dr. Jon Uggen, D.O., for progressively worsening knee pain.  Filing No. 10-2 at 506.  Welles rated his left knee pain as at a severity of

eight out of ten and his right knee pain at a five out of ten. *Id.* Dr. Uggen ordered an MRI to evaluate Welles's left knee pain, advised him to continue his Mobic prescription, and referred him to Dr. John Hain, M.D., "for evaluation of low back pain with radiculopathy." *Id.* at 508. A left knee MRI in July 2014 showed a torn meniscus and a focal cartilaginous defect. *Id.* at 479.

In July 2014, Welles was treated by orthopedic specialist John D. Hain, M.D. Filing No. 10-3, Tr. at 550-58; Filing No. 10-4, Tr. at 678-710. Dr. Hain reported that a CT scan in 2013 showed an annular tear with significant back and disc phenomenon at L5-S-1, noting "there appears to be a chronic partial right-sided L-5 superior facet fracture with intact pars interarticularis" and "there is severe left foraminal stenosis." *Id.* at 552. He recommended conservative treatment at that time for what he characterized as significant degeneration at L5-S1, but stated that surgical treatment could be necessary in the future. *Id.* He referred Welles to pain management services for evaluation of facet injections and an epidural injection and recommended an MRI. *Id.*

On August 12, 2014, Welles was treated at Midwest Anesthesia in Fremont by Soubrata V. Raikar, M.D. Filing No. 10-3, Tr. at 545, 577-87. Welles presented with low back, bilateral hip and left leg pain that had been present for three years. *Id.* at 545. Welles reported aching, constant pain at a level of seven on a scale of one to ten. *Id.* Examination showed "extension and rotation of the lumbar spine caused right low back pain" and "there was bilateral S1 joint pain with palpation, and patricks' test positive on the right." *Id.* at 546. Dr. Raikar noted forward flexion of 60 degrees, hyperextension of 25 degrees, and bilateral sciatic notch tenderness. *Id.* at 547. Dr. Raikar's assessment noted new problems of chronic left knee pain, chronic low back pain, sacroiliitis, poor

circulation, and numbness and tingling. *Id.* His notes indicate that chronic pain syndrome was discussed at length. *Id.* Dr. Raikar found Welles had "bilateral S1 joint mediated pain, right greater than left, as well as to a lesser degree lumbar facet joint mediated pain." *Id.* Dr. Raikar and Welles discussed bilateral S1 joint injections, to be administered after Welles's scheduled arthroscopic knee surgery, and Dr. Raikar stated they "would consider lumbar facet injections if needed after the S1 joint injections for residual back pain." *Id.* at 548. In March 2015, Nebraska Health Imaging was unable to complete the MRI study of Welles's cervical spine due to patient pain, but found multilevel degenerative cervical spondylosis resulting in significant spinal stenosis and neuroforaminal narrowing at multiple levels but most severe at C5-C6. Filing No. 10-4, Tr. at 630-31.

Records from follow ups in June 18, 2015, stated that Welles showed no improvement from cervical steroid injections. *Id.* at 583-86; Filing No. 10-5, Tr. at 659. Welles reported that numbness, tingling, pins and needles in his neck and bilateral shoulder and arm pain was the same as his last visit and he reported only ten percent relief for 1-2 days with his most recent cervical steroid injection. *Id.*

In early 2015, Welles was treated by Dr. McKnight for neck and shoulder pain, muscle aches, arthralgias, and back pain. Filing No. 10-4, Tr. at 590-93, 600. A physical exam on February 2, 2015, found Welles "tender over specific fibromyalgia trigger points, uppers traps, distal bicep, distal quad, lower lumbar region. Also, very [tender] over the bicep tendon origin bilaterally and pain with resisted flexion of the forearm." *Id.* at 601. Dr. McKnight diagnosed primary fibromyalgia syndrome, tendinitis, and insomnia. *Id.* In April 2015, Welles reported pain in his shoulders and

arms at a pain level of none out of ten.  *Id.* at 592.  Dr. McKnight noted that Welles had a recent MRI of the neck that showed "left sided radiculopathy with multilevel degenerative cervical spondylosis resulting of significant spinal stenosis, neuroforaminal narrowing at several levels."  *Id.* at 592.  Dr. McKnight also reported that Welles had tried multiple treatments for the pain, but they were unsuccessful.  *Id.*  As of April 2015, Welles's medications included benazepril, buspirone, Cymbalta, hydrochlorothiazide, Januvia, insulin, metformin, naproxen, Proventil inhaler, tizanidine, tramadol and trazodone.  *Id.* at 591.

Dr. Jon Uggen, D.O., at Fremont Orthopedics and Sports Medicine examined Welles for evaluation and treatment of knee and shoulder pain in March 2015.  Filing No. 10-3, Tr. at 564-568.  Welles related that his knee still bothered him and described a dull ache, catching, grinding, popping, swelling and weakness in his knee.  *Id.* at 566. He also complained of a new onset of left shoulder pain and described pain form his neck to his elbow.  *Id.*  He stated he had trouble sleeping and lifting.  *Id.*  Dr. Uggen obtained shoulder and knee radiographs and assessed Welles with primary arthritis of left knee, Acromioclavicular joint arthritis, cervical radiculopathy with positive Spurling left upper extremity, impingement syndrome, left shoulder, mild to moderate Osteoarthritis of left glenohumeral joint and biceps tendinitis on left.  *Id.* at 564.  X-ray Imaging on March 10, 2015 showed mild varus osteoarthritis in both knees.  *Id.* at 566. Shoulder x-rays showed moderate AC joint arthritis, Type II acromium/acromion, calcification at the insertion of the biceps tendon and mild to moderate arthritis of the glenohumeral joint.  *Id.*  At that visit, Welles had an injection to drain the bursa and a subacromial left shoulder cortisone injection.  *Id.*  Because he had a positive Spurling

with radicular symptoms down his arm, he was referred to a spine surgeon for evaluation of his cervical spine.  *Id.* at 566.

On June 30, 2015, Welles was seen by Dr. McKnight for left leg numbness. Filing No. 10-6, Tr. at 723.  Filing No. 10-6, Tr. at 723.  On July 13, 2015, orthopedic surgeon John D. Hain, M.D., examined Welles and recommended standard anterior cervical discectomy at C4-C5 and C5-C6 secondary to disc herniations on the left at each level.  Filing No. 10-5, Tr. at 696.

An MRI of the lumbar spine on July 29, 2015, showed disc degeneration throughout the lumbar spine with some narrowing at L2-3 and L5-S1.  *Id.* at 698-99; Filing No. 10-6, Tr. at 735.  Impression was mild broad disk bulge L2-3 with a small right paramidline disk protrusion with some narrowing of the right lateral recess and some mild to moderate degenerative changes of the facets at that level, as well as a mild to moderate broad disk bulge at L3-4 and L4-5 with mild to moderate degenerative changes involving the facets at those levels.  Filing No. 10-5, Tr. at 699.  There was also a mild to moderate broad disk bulge at L5-S1, which, in combination of moderate degenerative changes of the facets results in some right foraminal narrowing.  *Id.*  The MRI reported no evidence of focal disk extrusion or spinal stenosis.  *Id.*

Dr. Hain performed an anterior cervical discectomy and fusion of C4-C5, C5-C6 on August 12, 2015.  *Id.* at 703-704.  At a post-operative follow-up on September 1, 2015, Certified Physicians' Assistant Cindy Sedlak reported that Welles complained of pain in his left shoulder and trapezius and "some pain that goes down to his hand intermittent," but he felt "somewhat better."  *Id.* at 706.  On September 9, 2015, Welles saw Dr. McKnight and reported he was still having pain in his neck and shoulder.  Filing

No. 10-6, Tr. at 715.  Dr. McKnight noted Welles's neck incision was healing, but with respect to chronic pain, there was not as much improvement as expected.  *Id.* at 717. He assessed cervical pain, radicular; anxiety; hypertension; and primary fibromyalgia syndrome and prescribed trazodone, buspirone, Cymbalta and tizanidine.  *Id.*  Dr. McKnight referred Welles to Dr. Jon Uggen for the shoulder pain.  *Id.*  At a consultation on October 12, 2015, Dr. Hain noted that neck pain was still an issue.  Filing No. 11-5, Tr. at 1156.  In June 2016, Welles was seen by Dr. McKnight for follow up on shoulder pain after finishing physical therapy.  Filing No. 11-3, Tr. at 1068.  He complained of shoulder pain, neck pain, and pain down the arm at a level of seven to eight on a scale of one to ten.  *Id.* at 1071.

In August 2016, Welles presented at the emergency room with complaints of abdominal pain.  *Id.* at 1141.  He was admitted to the hospital and was assessed as having acute abdominal pain, diverticular flare up, diverticular disease of the colon, type II diabetes poorly controlled, possible abscess of the rectum, major depressive disorder, stable, and hypertension, controlled.  *Id.* at 1140.  He was diagnosed as having diverticulitis and pancreatitis.  *Id.* at 1137.  On September 19, 2016, Welles had outpatient surgery at Fremont Health Medical Center involving hypertrophy of sphincter muscle and a small anal fissure.  *Id.* at 1117.  On January 9, 2017, he underwent another outpatient procedure for an anal fissure and a necrotic internal hemorrhoid. Filing No. 11-5, Tr. at 1103.  He underwent a sphincterotomy at Nebraska Medicine on April 20, 2017.  Filing No. 11-8, Tr. at 1272 – 75.

Records in 2016 indicate that Welles continued to complain of shoulder, neck, and back pain.  Filing No. 11-3, Tr. at 1031, 1039.  A cervical spine X-ray on January

11, 2016, was compared to earlier imaging in October 2015 and showed no specific radiographic evidence of hardware complication, but showed that mild degenerative disk disease was suggested at the C3-4 level, similar to the prior at C4-6. Filing No. 11-5, Tr. at 1148. The radiologist 's impression was "C4 through C6 surgical fusion appearing similar to prior with minimal chronic anteriolisthesis of C4 on C5." *Id.*

On Jan 3, 2017, Welles was seen by Dr. McKnight to evaluate chronic pain. Filing No. 11-3, Tr. at 1039. Welles complained that right knee had really been bothering him. *Id.* Dr. McKnight reported his blood sugar was 166, his depression and anxiety were worse, he still had knee pain and had an abscess in the perineum on which dr. McKnight was awaiting follow up reports. *Id.*

On February 3, 2017, Welles was again seen by Dr. McKnight complaining of chronic pain, worsening left shoulder pain and left knee pain. *Id.* at 1031. Dr. McKnight reviewed Welles's problems, including neuropathy, other unspecified polyneuropathies, diverticulitis, foot callus, and abscess in perineum. *Id.* Welles continued to experience cervical and knee pain. *Id.*

In correspondence dated May 17, 2017, Dr. McKnight reported that Welles's multiple illnesses and degenerative back disease made him unable to sit for more than twenty minutes. Filing No. 11-9, Tr. at 1352. Dr. McKnight further stated that Welles could walk only a block, was unable to lift more than 10 pounds, and cannot do any twisting, or prolonged standing or walking. *Id.* Also, he stated that Welles would be unable to stand, walk or sit for six hours out of an eight hour day and that he would need frequent rest periods to recline and keep his feet elevated. *Id.* Moreover, he stated that Welles would likely miss more than three days of work per month. *Id.* Dr.

McKnight concluded that Welles's "disabling conditions would not allow him to work an eight-hour day, five days a week on any regular basis and he would be unemployable." *Id.*

On October 5, 2015, state agency medical consultants Jerry Reed, M.D., and Robert Roth, M.D., reviewed Welles's medical records and assessed Welles's physical RFC for the periods November 26, 2014, to August 11, 2015, and from August 12, 2015 to August 12, 2016. Filing No. 12-4, Tr. at 198-202, 222-27. Both physicians opined that Welles could frequently lift 10 pounds and occasionally lift 20 pounds. *Id.* Drs. Reed found Welles could stand or walk for a total of total of three hours and Dr. Roth found he could stand or walk for four hours, and both doctors found Welles could sit, with normal breaks, for more than 6 hours on a sustained basis in an 8-hour workday. *Id.* at 177, 198. Based on the strength factors of Welles's physical RFC, application of the Medical-Vocational rules resulted in the finding that Welles demonstrated a maximum sustained work capability for sedentary work. *Id.* at 161, 179, 205. In making his RFC assessment, Dr. Reed stated that "claimant is showing good signs of progress from his C spine fusion, 12 months following his surgery, he would be capable of resuming sedentary work activities. Prior to surgery, he would be capable of other sedentary restrictions as listed in the other RFC." *Id.* at 202. On reconsideration, with allegations of more neck pain, low back pain, fibromyalgia and overall body pain, and new allegations of shoulder pain, the Appeals Council found that sedentary restrictions appeared appropriate at the time. Filing No. 12-5, Tr. at 220.

In discounting Dr. McKnight's conclusions, Dr. Roth stated on May 24, 2015, that Dr. McKnight relied heavily on the claimant's history and Dr. McKnight's conclusions

were inconsistent with his own preoperative examination of August 2014. *Id.* at 222. Dr. Roth found no evidence of Welles's need to rest or recline throughout the day. *Id.* Dr. Reed echoed that opinion. *Id.* at 225.

Catherine Saeger, LCSW (licensed clinical social worker), evaluated and treated Welles for depression on May 5, 2014, at Park Professional Group in Fremont, Nebraska. Filing No. 10-3 at 526, 528. Saeger addressed issues of Welles's low mood and low energy, exacerbated by physical and financial difficulties, and discussed goals and coping mechanisms with Welles. *Id.* at 528. Welles continued to seek counseling with Ms. Saeger to address his ongoing depression throughout 2014 and early 2015. *Id.* at 541, 539, 537, 535, 533. Ms. Saeger noted Welles's low mood, low energy, and his unkempt appearance. *Id.* at 530.

On February 3, 2015, Ms. Saeger opined that Welles was "not employable" because of chronic pain, diabetes, obesity, and "symptoms of significant depression and anxiety." Filing No. 10-3 at 525. On June 23, 2015, she reported Welles was diagnosed with Depressive disorder. Filing No. 10-5, Tr. at 643. She stated that his low mood, feelings of hopelessness and guilt, and lack of sleep interfered rendered him incapable of managing activities of daily living. *Id.* Ms. Saeger opined that Welles's excessive worrying, isolation, and panic attacks made it impossible for Welles to concentrate, engage appropriately with others, or complete task correctly. *Id.*

Consulting psychologist Dr. Holly Filcheck, Ph.D. performed a consultative mental examination in April 2015 Filing No. 10-3, Tr. at 570-74. Dr. Filcheck opined that Welles did not have difficulty with activities of daily living or social functioning due to mental health and that he would not have difficulty understanding, remembering, or

carrying out simple instructions.  *Id.* at 572.  She also opined that Welles had adequate social skills to relate to coworkers and supervisors and could adapt to changes in his environment.  *Id.*

In a mental residual functional capacity assessment, state agency psychological consultant Lee Branham, Ph. D. found Welles had understanding and memory limitations and was moderately limited in his ability to understand, remember, and carry out detailed instructions and in his ability to maintain attention and concentration for extended periods.  Filing No. 12-4, Tr. at 203.  In May 2015, state agency psychological consultant Patricia Newman, Ph.D. explained in a psychiatric review technique form that Welles's diagnosis was adjustment disorder with depressed mood and anxiety and characterized his symptoms as slight and "due to his life situation."  *Id.*

The record shows that in determining that Welles was not disabled, the Commissioner considered and relied on the medical evidence submitted in connection with the earlier application, and on the ALJ decision of November 24, 2014.  *Id.* at 72, 220.

### 3.    The ALJ's Findings

In evaluating Mr. Welles's claim, the ALJ followed the sequential evaluation process.  Filing No. 12-2, Tr. at 15-27.  The ALJ found Welles had not engaged in substantial gainful activity since his alleged onset date of November 25, 2014.  *Id.* at 15. He found Welles had the following severe impairments:  degenerative joint disease of the left shoulder, degenerative disc disease of the spine, diabetes, obesity, depression, and anxiety.  *Id.*  He also found that Welles had a history of carpal tunnel syndrome, hypertension, and anal fissure and surgery, but those impairments were not expected to

last beyond 12 months and were considered nonsevere.  *Id.* at 15-16.  He stated that the record contained no diagnoses or treatment related to fibromyalgia, and found that Welles's alleged fibromyalgia was not a medically determinable impairment.  *Id.* at 16.

He found Welles's severe impairments did not meet or equal the listing of impairments that would render him presumptively disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"), but determined Welles had the residual functional capacity ("RFC") to perform light work, with several additional environmental limitations.[3]  *Id.* at 16-19.  With that RFC, the ALJ found Mr. Welles could not perform his past relevant work, but could perform other light, unskilled work, such as an information clerk, a routing clerk, and a furniture rental clerk.  *Id.* at 25-27.  Consequently, the ALJ found Mr. Welles was not disabled.  *Id.* at 27.

The ALJ acknowledged that Welles's medically determinable impairments could have reasonably produced his symptoms, but nonetheless did not afford great weight to Welles's testimony because his "statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence contained in the record for the reasons explained in this decision."  *Id.* at 20.  He stated that after "a successful anterior cervical discectomy and fusion at C4-6," Welles "reported no radicular symptoms and his neck pain was improving."  *Id.* at

---

[3] The ALJ added the following limitations to Welles's capability to perform light work:  he would be precluded from the use of ropes, ladders, or scaffolds; he would  avoid concentrated temperature extremes, vibration, the use of foot controls with both lower extremities, or workplace hazards (i.e., unprotected heights or close proximity to dangerous moving mechanical parts); he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; he could occasionally reach overhead with his left upper extremity; and he would be limited to simple instructions and tasks.  Filing No. 12-2, at 16.

21.    Further he stated the course of treatment for Welles's lumbar spine was conservative and noted "the file show[s] no evidence that his cervical and lumbar spine have further degenerated.    *Id.*    He further stated "the medical evidence contains no support that pain from cervical spine surgery remained severe and lasted beyond 12 months.  Instead, it seems to have been going well."  *Id.*

The ALJ gave only "some weight" to the opinions of state agency medical consultants Dr. Roth and Dr. Reed because he characterized their opinions as only "partially consistent" with the medical record, noting that the doctors limited Welles to "3-4 hours of standing and walking, which essentially reduces him to sedentary work."  *Id.* He also noted the opinions were rendered prior Welles's cervical spine fusion, which the ALJ characterized as "successful."  *Id.*  The ALJ concluded that, while Welles did experience some limitations, the objective medical evidence did not sustain his allegations of a disabling impairment.  *Id.*

The ALJ stated he relied heavily on the medical evidence of record, the claimant's activities of daily life, Welles testimony, and SSR 96-8p and 85-15 is assessing Welles's RFC.  *Id.* at 25.  He found the evidence supports Welles's ability to perform light work, defined as the ability to lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk for six hours; and sit for six hours in a normal workday," noting "there is no evidence to limit the claimant beyond the RFC" of capability to perform light work with some additional limitations.  *Id.* at 21.

The ALJ found that the opinions of Welles's treating counselor (Catherine Saeger, LCSW), and his primary treating physician (Thomas McKnight, M.D.) were not entitled to controlling weight, as both providers expressed "opinions on issues reserved

to the Commissioner." *Id.* at 23. He also found that Ms. Saeger's opinion was outside her specialty as a licensed clinical social worker and was not related to physical health issues. *Id.* at 23. The ALJ gave "more weight" to the consulting psychological examiner (Holly Filcheck, Ph.D.), as it was "more consistent with the medical evidence." *Id.* Dr. Filcheck opined that "if [Welles] were to receive consistent, effective therapy, his symptoms should improve significantly." *Id.*

The ALJ considered the Welles's age, education , work experience and RFC in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App'x 2, in determining whether Welles could make a successful adjustment to other work. *Id.* at 26. He noted that if Welles had the RFC to perform the full range of light work, a finding of "not-disabled" would be directed by Medical-vocational Rules 202.21 and 202.14. *Id.* Because Welles's abilities were impeded by the additional limitations the ALJ imposed, he relied on the vocational expert's testimony in finding that there were jobs in the national economy, such as an information clerk, that Welles could perform. *Id.* at 26.

## II. DISCUSSION

### A. Law

A claimant's failure to raise an Appointments Clause challenge before the ALJ forfeits the issue upon judicial review. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878–79 (1991) (holding that Appointments Clause challenges are nonjurisdictional and can be forfeited if they are not timely asserted*); see also NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013) (holding party waived Appointments Clause challenge by failing to raise the issue before the agency). Indeed,

only "a party who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Lucia*, 138 S. Ct. at 2055.

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence "is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229.

However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's

current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity ("RFC") and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4). At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin,*

815 F.3d 1126, 1131 (8th Cir. 2015).   An ALJ's RFC determination (1) must give appropriate consideration to all of a claimant's impairments; and (2) must be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting.   *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

In order to be supported by substantial evidence, an ALJ's RFC finding must be supported by a treating or examining source opinion.   *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *see also Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007). A claimant's RFC is a medical question and "'an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.'"   *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008).   "The ALJ 'may not simply draw his own inferences about plaintiff's functional ability from medical reports.'"   *Id.* (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)).

Under the regulations governing claims filed before March 27, 2017, if a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.[4]   *See* 20 C.F.R. § 404.1527(c)(2).   If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the

---

[4] The regulations have since been amended and reorganized—20 C.F.R. §§ 404.1527 and 416.927 have been superseded by 20 C.F.R. §§ 404.1520c and 416.920c for claims filed after March 27, 2017.  *See Seay v. Berryhill*, No. 5:16-CV-05096-VLD, 2018 WL 1513683, at *39 (D.S.D. Mar. 27, 2018).   However, 20 C.F.R. §§ 404.1527 and 416.927 still apply to this case, which was filed before the effective date of the new regulations.  *Id.*

treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. § 404.1527(c)(2)-(6).  Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015).  "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process:  (1) first, the ALJ considers whether there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work.  Soc. Sec. Rul. 16-3p, 81 Fed. Reg. 14166-01, 2016 WL 1020935(F.R.) (Mar. 16, 2016) (Policy Interpretation Titles II & XVI:  Evaluation of Symptoms in Disability Claims).  In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case

record." *Id.*, 81 Fed. Reg. at *14168. To determine the intensity, persistence, and intensity of an individual's symptoms, the ALJ evaluates objective medical evidence, but will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. *Id.* However, the ALJ must not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* at *14169. If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he must carefully consider other evidence in the record—including statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in the Social Security regulations—in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. *Id.* Those factors include: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *14169-70.

Social Security Ruling 16-3p also provides :

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.   Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at *14170.   "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."   *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Singh* v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000)).   Allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications.   *Id.*   Similarly, a failure to follow a recommended course of treatment also weighs against a claimant's credibility.   *Id.*

### B.    Analysis

The Court first finds it need not address Welles's Appointments clause claim because it was not presented in administrative proceedings.   Next, the Court finds that the ALJ erred in not affording controlling weight to the opinion of Welles's treating physician, Dr. McKnight, who had treated Welles on a regular basis for several years. In Dr. McKnight's opinion, Welles was unable to sit for more than 20 minutes at a time, could walk about a block, could lift up to ten pounds, could not do any twisting or prolonged standing or walking, was unable to stand/walk or sit for six hours in an eight-

hour day, would miss more than three days of work per month, and could not work an eight-hour day, five days a week on a regular basis. In view of the nature and extent of the treatment relationship and the objective evidence that supports Dr. McKnight's opinions, the ALJ should have fully credited his testimony.

Nothing in the record refutes those limitations, and then state consulting physicians' opinions are substantively in accord with Dr. McKnight's. The consulting physicians agree that Welles is capable of only sedentary work. All of the medical source opinions support the conclusion that Welles can stand/walk for only 2-3 hours in a workday.

Though the conclusion that Welles would not be employable may be a decision reserved to the Commissioner, the assessment of Welles's medical limitations and condition is not. The ALJ's finding that Dr. McKnight's assessment is inconsistent with the record as a whole is not supported by the evidence. In making his finding that Welles retained the RFC for light work, the ALJ effectively rejected both the treating physician's and consulting physicians' findings on exertional limitations with respect to standing, sitting, and or walking. The ALJ improperly relied on inconsequential snippets of evidence (i.e., normal gait) that arguably supported a finding of no disability, while ignoring voluminous objective medical evidence that fully supports Welles's complaints of debilitating pain.

Moreover, the medical evidence does not support the ALJ's conclusion that Welles's neck pain had resolved following his spinal fusion surgery. He reported to several treatment providers that the surgery had not provided significant relief, nor had physical therapy. He continued to report radiculopathy and to seek medical treatment

and pain relief.  His complaints of cervical and lumbar pain are supported by objective medical evidence such as X-rays and MRIs.  Also, the ALJ's finding that there was no diagnosis or treatment of Welles's alleged fibromyalgia in the record is plainly incorrect. Welles was diagnosed with fibromyalgia, confirmed by trigger point tenderness, in February 2015 and Dr. McKnight prescribed Cymbalta to treat it.  Further, there is evidence of peripheral neuropathy in the record.

The ALJ also improperly evaluated Welles's complaints of disabling pain. Although the ALJ found that Welles had medically determinable physical impairments that could reasonably be expected to produce his symptoms, his credibility determination rested on an erroneous assessment of Welles's daily activities.  Welles's prior work history, daily activities, medical history and treatment record, medications and side effects all weigh in favor of crediting his testimony of relentless pain.  His testimony at the hearing is consistent with, and corroborated by, statements he made to numerous medical practitioners over several years.  Over the time period in question, Welles consistently visited doctors, sought treatment by numerous specialists, underwent numerous invasive procedures, and participated in physical therapy and counselling. Those are not the actions of a malingerer.  Objective medical evidence supports the level and intensity of the plaintiff's pain.

The ALJ further erred in failing to consider Welles's mental limitations.  The record supports a finding that Welles suffered from depression and anxiety and had moderate limitations as far as his abilities to follow directions and to sustain concentration.  The fact that Welles's counsellor was not an acceptable medical source is of no importance because even the state consultants diagnosed depression and

anxiety. The evidence of Welles's treatment by his counselor—a licensed clinical social worker—though not controlling from a diagnosis standpoint, should have been considered in connection with Welles's credibility and his testimony with respect to the frequency and intensity of his limitations. The ALJ's statement that the plaintiff was inconsistent in seeking mental health treatment is also belied by the record. The fact that at the time of the hearing Welles had not seen a therapist for two months is a slim reed on which to base that conclusion. Moreover, the record shows that the reason he was not treated for two months was that his therapist had retired. Also, the record shows that Welles continued to be prescribed medications for depression and anxiety.

The ALJ's selective rejection of some of the opinions of consulting psychologists, and not others, was also error. The record shows no reason to accept the opinion of Dr. Filcheck over those of the other reviewing psychologists when Dr. Filcheck admitted she had not reviewed the counsellor's notes because they were illegible. Also, the record shows Welles's mental condition had deteriorated after the consultants' examinations and opinions. The ALJ improperly focused on situational stressors such as the death of Welles's father and his son, in reaching his conclusion that Welles had no disabling mental limitations. The record shows that treatment of Welles's mental complaints predated those events.

The ALJ further erred in making his RFC determination. He failed to properly consider Welles's complaints of pain and, most importantly, the ALJ substituted his own opinion for that of the medical experts. All medical source evidence supports the conclusion that Welles is only capable of sedentary work. The ALJ's RFC determination is not supported by a treating or examining source opinion. There is no medical

evidence to support the finding that Welles could function in the workplace at the light level of exertion.  The ALJ simply drew his own inferences about Welles's functional ability from the record.

Because the ALJ failed to account for Welles's subjective complaints of pain, he posed an incorrect hypothetical to the vocational expert.  The vocational expert testified there would be no jobs in the national economy for a person with the limitations imposed by the treating and examining physicians.  The ALJ also failed to consider Welles's numerous severe impairments in combination and to consider obesity as it related to Welles's other impairments.

## III.    CONCLUSION

The clear weight of the evidence points to a conclusion that Welles has been disabled since his claimed onset date of November 25, 2014.  Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.  *See Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001).  Accordingly,

IT IS ORDERED:

1.  Plaintiff Welle's motion to reverse (Filing No. 16) is granted;

2.  The defendant's motion to affirm (Filing No. 18) is denied;

3.  The decision of the Commissioner is reversed; and

4.  This action is remanded to the Social Security Administration for an award of benefits.

Dated this 7th day of February 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge